IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL |
| | : | NO. 21-65 |
| v. | : | |
| | : | |
| JOHN DOUGHERTY and | : | |
| GREGORY FIOCCA | : | |

**MEMORANDUM OPINION**

**SCHMEHL, J.** **/s/ JLS** **May 2, 2022**

The Court is presented with three issues on the eve of trial. Whether the Government has sufficiently alleged a conspiracy to commit extortion against the two defendants. Whether statements were made before the existence of or during the existence of the alleged conspiracy. What evidence may be presented at trial for non-propensity uses under Federal Rule of Evidence 404(b).

**I.** **Relevant Factual Background**

The Government alleges that "on or before August 19, 2020, though January 20, 2021," defendants John Dougherty and Gregory Fiocca conspired to commit extortion and committed extortion. (ECF #1, Indictment, ¶6.) The defendants conspired "to obtain from an electrical contractor . . . [compensation to Fiocca] . . . for services not performed . . . which was induced by the wrongful use of actual and threatened force, violence and fear, including fear of economic harm. (*Id.*)

Defendant John Dougherty was the highest ranking official, the Business Manager, of Local 98 of the International Brotherhood of Electrical Workers. Defendant Gregory Fiocca is an employee of Local 98 and Dougherty's nephew. Since at least 2013, Dougherty was placing Fiocca on job sites despite Fiocca's incredibly poor work performance.

As discussed in more detail throughout this Opinion, Fiocca would show up late, leave early, sleep on the job, and yell at, spit on and assault supervisors. Dougherty was aware of Fiocca's abysmal performance and seemed to always be displeased. He would say things to others such as: "I told [Fiocca that] I instructed the foreman to call me when he is late or does not come in to work. I told [Fiocca] not to embarrass you, the family, and himself"; he told Fiocca to "keep your mouth shut, work [hard]"; "you can't [mess] this up"; "he's got to show up, he's got to work"; "I am so sick and [] tired of it, it makes me ill"; Dougherty apologized to a superintendent for Fiocca's actions on at least one occasion; and as Dougherty himself put it, Dougherty was doing "as much as [he could] to help him." But Dougherty continued to place Fiocca on jobs.

The Government seeks to admit nine incidents between December 2013 and April 2016 that show Fiocca's abysmal work performance, Dougherty's knowledge of it, and Dougherty's subsequent actions. In addition, the Government seeks to admit two instances of bar fights Fiocca was in, and Dougherty's action of paying two other family members for time that they did not work. Dougherty's actions after each of Fiocca's poor work performances are very analogous to what he did at the incident in question. Each time, Dougherty complained about Fiocca's behavior, he hoped that Fiocca would change his behavior, but Fiocca never did. Fiocca's behavior continued and so did Dougherty's. Dougherty continued to place Fiocca on job, he gave Fiocca at least one pay raise that Fiocca was allegedly not entitled to, and he put him on jobs, including the job at issue in this case, as the Steward, which is a leadership role that represents all electrical workers at the job site, amongst other responsibilities.

With this history in mind, in October 2019, Dougherty once again appointed Fiocca to be the Steward at a job site. This job was the construction of a new casino in South Philadelphia.

During the construction, in July 2020, Fiocca, presumably barely working, received less than 40-hour's pay. Fiocca voiced his displeasure and complained to his supervising contractor.

The next month, August 2020, Fiocca again received under 40-hour's pay, but this time, his displeasure met new heights. According to the Government, the contractor sensed Fiocca's displeasure and knew Fiocca was coming into his office so he audio-recorded the confrontation. Fiocca came in, grabbed the contractor by the neck, threw him on a table, and threatened him with further violence and economic harm such as: "there's nothing you can do to me. I'm getting my money," "I'll [] break your face," "we're pulling the whole job, you know that, right now. I'm calling my uncle already . . . ." (Indictment, ¶6.)

Dougherty caught wind of the situation on the same day. Three Local 98 members went to the contractor to hear his side of the story. After the contractor informed them about what had transpired one member walked away to call Dougherty. When he returned, he informed the contractor that "nothing concerning [Fiocca's] employment was going to change," and Dougherty threatened that:[1] (1) he "would no longer allow the Local 98 electricians working for the contractor to work overtime"; (2) he "would force the contractor to operate three shifts of Local 98 electricians on the job"; (3) he "would pull all of the Local 98 electricians off of the job"; and (4) he "might try to prevent the contractor from getting a large electrical job in Philadelphia." (Indictment, ¶7.)

After Fiocca's assault and Dougherty's threats of economic harm, Fiocca remained on the job until January of the next year. Each paycheck Fiocca received thereafter constitutes a Count of extortion, totaling eighteen Counts of extortion, and one Count of Conspiracy to Commit Extortion.

---

[1] The Indictment does not state nor is the Court privy as to how Dougherty made these threats.

Presently, defendants have filed a Motion to Dismiss, a Motion to Compel identification of a confidential informant,[2] a Motion to Preclude the contractor's audio-recording of the assault, and a Motion to Preclude the confidential informant's recording of a telephone conference between Dougherty and Local 98 business agents after the assault. The Government filed a Motion to admit evidence under Federal Rule of Evidence 404(b). The evidence includes nine prior incidents of Fiocca's work behavior and Dougherty's subsequent responses, two instances of Fiocca bar fights, and evidence that Dougherty had Local 98 pay two other family members for work not performed. The Court held argument during the pretrial conference on April 27, 2022.

## II.  Analysis

### 1. Dougherty's Motion to Dismiss the Indictment is Denied.

Defendant John Dougherty moves to dismiss the indictment by arguing that the Government has failed to allege, nor can they prove, that he engaged in extortion nor participated in a conspiracy to engage in extortion. In *United States v. Enmons* the Court held that "the [Hobbs Act] does not apply to the use of force to achieve legitimate labor ends." 410 U.S. 396, 401 (1973). Also known as the claim of right defense. Dougherty argues that his alleged extortionate actions were just attempts to ensure that his employee and nephew, defendant Fiocca, obtained his appropriate compensation—a legitimate labor objective under *Enmons*. Thus, the claim of right defense as articulated in *Enmons* demands dismissal.

---

[2]  The Court and the parties have agreed that the best way to handle this confidential informant issue at this time is for the Court to review any and all information that the informant provided to the Government. The Court will determine whether any of that information is relevant, exculpatory, or infringes upon Dougherty's Sixth Amendment Right to Counsel given that the information was being provided during a separate criminal case against Dougherty and others that this Court is very familiar with. *See United States v. Dougherty, et al.*, Eastern District of Pennsylvania, ECF 19-64.

Generally speaking, ensuring that union employees obtain their appropriate compensation is a legitimate labor objective. For example, a labor strike to achieve this does not constitute extortion given the language of the Hobbs Act, *Enmons*, and *Enmons'* progeny. However, the Government's allegations in this indictment run contrary to Dougherty's "legitimate labor end" of obtaining appropriate compensation for his employee and nephew.

The focus point of this entire case is that Dougherty and Fiocca did not have a legitimate labor objective, but rather used violence and economic threats to extract compensation for Fiocca that he was not entitled to at a specific job site. Thus, the Government's allegations are that Fiocca's claim to the compensation was illegitimate, and along with Dougherty's help, his claim constitutes extortion. Defendants are entitled to put forth evidence that supports their claim of right defense and the jury will be instructed appropriately. But at this stage, defendants are not entitled to dismissal of the indictment under *Enmons*.

### 2. The Audio-Recording of the Assault is Admissible as an Opposing Party's Statement; Not a Statement by a Co-Conspirator.

Dougherty moves to preclude the audio-recording of the assault and verbal threats Fiocca made on August 19, 2020, as it pertains to him as an alleged co-conspirator. The Court may admit the recording as a non-hearsay statement if the Government proves by a preponderance of the evidence that the recording was made while (1) a conspiracy existed; (2) Fiocca and Dougherty were members of the conspiracy; (3) Fiocca's statements were made during the conspiracy; and (4) the statements were made in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E); *see United States v. Weaver*, 507 F.3d 178, 181-84 (3d Cir. 2007).

Here, the charge in the Indictment as well as the facts surrounding the alleged conspiracy render it temporally impossible for Fiocca's statements to be made while the conspiracy existed. The Government alleges that the conspiracy began "on or about August 19, 2020." On this date,

5

Fiocca assaulted the contractor, and Dougherty made his economic threats to the same contractor after hearing what had happened. These actions together consummated the alleged conspiracy.

The Government specifically alleged that the defendants "knowingly and intentionally conspired and agreed . . . [to extort] . . . from an electrical contractor . . . [compensation to Fiocca] . . . for services not performed . . . induced by the wrongful use of actual and threatened force, violence and fear, including fear of economic harm." (Indictment, ¶6.) On August 19th, both defendants allegedly came to this mutual understanding to extort this specific contractor in the specific manner of Fiocca committing and threatening violence, and Dougherty threatening the economic harm. In comparison, Fiocca's audio-recorded assault and threats were made on his own accord without Dougherty's specific knowledge. When Fiocca committed the assault and made the statements, the Government's alleged conspiracy could not have existed. Dougherty was not there. There is no evidence that Dougherty told him to commit these actions. Dougherty had no clue that this incident occurred until after Local 98 members informed him about it. Dougherty then made his economic threats only after being informed. Thus, Dougherty and Fiocca could not have conspired or had a mutual agreement to extort this specific contractor by Fiocca assaulting him and then Dougherty following it up with economic threats until after Dougherty learned of Fiocca's assault.

While the Government has substantial evidence that Dougherty and Fiocca had, in essence, a mutual understanding where Fiocca would be placed on jobs, he would do little to no work, he would get chastised by his supervisor, and Dougherty would still employ him and place him on jobs. This longstanding mutual understanding—that Fiocca could work abysmally and still maintain employment—is not the same as the alleged conspiracy in this case. Agreeing to help your nephew and employee no matter how bad of a worker he is, is not the same as agreeing

6

to extort a specific contractor in the specific manner of using violence and distilling economic threats.

As much as the Government wants the conspiracy to include the below Rule 404(b) evidence, and more, it may not do so under its own charge in the Indictment and the facts surrounding the extortion of the casino contractor. In other words, the Government may not import the defendants' longstanding history, knowledge and actions between one another as co-conspirator statements when the alleged conspiracy had not yet begun.

The Government also argues that the defendants had started the conspiracy in October 2019, roughly 10 months before the assault. They argue that when Dougherty appointed Fiocca as the Steward for the job in question the two had the mutual understanding of the conspiracy at that time. But again, knowing that Fiocca would perform abysmally and that Dougherty would tolerate and support it is not the same as conspiring "on or about August 19, 2020" to extort this specific contractor in the specific manner of "wrongful use of actual and threatened force, violence and fear, including fear of economic harm."

The defendants could not have come to the specific conspiracy that the Government alleges in this case until after Dougherty hears of and reacts to Fiocca's actions and words. While Fiocca's actions and words may have put the conspiracy on the table, there could not be a mutual agreement between the defendants of the specifically alleged conspiracy until Dougherty consummated it with his end of the bargain. Thus, Fiocca's recorded actions and statements were made before the alleged conspiracy had begun. Accordingly, the recording of the assault may only be admitted as an admission by a party opponent.[3]

---

[3] The recording is highly prejudicial to Dougherty given the verbiage and nature of the incident. However, as already stated, Fiocca's assault and threats put the conspiracy on the table. Dougherty acknowledged it and then joined by putting forth his economic threats. The Court will not shield Dougherty from the main incident in the case.

7

### 3. The Confidential Informant's Recording of Dougherty's Business Meeting is Admissible Against Fiocca as a Statement by a Co-Conspirator and Fiocca's Request for Severance is Denied.

In contrast to the prior section, Dougherty's statements that were recorded by the confidential informant were made during and in furtherance of the alleged conspiracy. Five days after the assault and economic threats, Dougherty held a telephonic conference meeting with many Local 98 business agents. During the call, which spanned around an hour, Dougherty commented on Fiocca's assault. He stated: "we had a minor issue down there . . . [the contractor] was getting tired of paying Greg Fiocca. So, I told him with all them things on his plate . . . I'm shocked that he paid attention to a steward. . . . So, when the steward had a little physical confrontation, allegedly with the superintendent, we weren't down there to make kumbaya."

These statements made on August 24, 2020, were made during the alleged conspiracy which ran from August 19, 2020, to January 20, 2021. They were made in furtherance of the conspiracy because Dougherty is telling his business agents his view on the incident, and he expresses his continuing support for Fiocca. The prejudicial value of these statements is minimal. Although Dougherty states various expletives, his statements do not necessarily make much literal sense. The recording also helps put the assault, and Dougherty's and Fiocca's relationship in an appropriate context. The Government may present these statements to the jury.

### 4. The Government's 404(b) Evidence.

The Government requests to admit twelve similar crimes and acts of Dougherty and Fiocca to "prove the existence of the charged conspiracy," the defendants' knowledge, intent, motive, lack of mistake and plan, and to rebut the defendants' anticipated defenses.

---

The alleged extortion scheme was born from Fiocca's actions and words, therefore, it is highly probative of the extortion that allegedly followed and its prejudice cannot overcome it probative value.

Federal Rule of Evidence 404(b) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person . . . . It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." Fed.R.Evid. 404(b). Such evidence is only admissible if it (1) has a proper purpose; (2) is relevant; (3) its probative value must outweigh its potential of unfair prejudice; and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it is admitted. *United States v. Givan*, 320 F.3d 452, 460 (3d Cir. 2003) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988). *But see United States v. Morley*, 199 F.3d 129, 137 (3d Cir. 1999) ("Neither a trial court nor an appellate court is comforted when a proponent attempts to justify 'bad act' evidence by resorting to a mantra-like recitation of the provisions of Rule 404(b) . . . . we require the prosecution to clearly articulate how that evidence fits . . . .") (citation omitted).

The Government proposes nine instances from 2013 to 2016 of Fiocca performing abysmal work and Dougherty responding to it, two instances of Fiocca getting into bar fights, and Dougherty allegedly paying two other relatives for work not performed. First, consistent with the Court's prior findings, the proposed similar crimes and acts spanning from 2013 to 2016 are not part of the "charged conspiracy." In 2013 to 2016, the electrical work at the casino job at issue did not exist. The defendants could not have conspired to extort this specific contractor roughly five years before the project even began.

The Government is correct that some of these prior acts displays the defendants' knowledge, intent, motive, and rebuts the defendants' likely defenses. Specifically, this evidence has non-propensity uses such as showing Fiocca's knowledge and plan as it pertained to his work, Dougherty's awareness of Fiocca's poor work performance, and Dougherty's absence of

9

mistake, motive in keeping Fiocca a Local 98 employee and acceptance and support of Fiocca's performance. This evidence supports the Government's theory that the defendants had a longstanding relationship of Fiocca performing abysmal work, and Dougherty, as he allegedly did with his other family members, tolerated and supported Fiocca's behavior. This bolsters the Government's case-in-chief in that Dougherty did not simply side with his employee in an isolated dispute at the casino job. Rather, Dougherty was aware of the likely reality as to what happened at the casino job, but he still sided with Fiocca and still threatened the economic harm.

The question then is whether the probative value of this evidence is substantially outweighed by its prejudicial effect. This question is best adjudicated by finding an appropriate balance of admitting some of this evidence to support the Government's theory while also ensuring that the defendants are not prejudiced by misleading bar fights, and cumulative five-year-old propensity-related evidence.

The two bar fights the Government proposes have very little to do with whether these defendants committed extortion, and whether Dougherty knew of and tolerated Fiocca's work behavior. The bar fights would simply shed a negative light on Fiocca and bring a high likelihood of a propensity-based verdict which the Court will not permit. Similarly, the allegations that Dougherty authorized payments to other relatives for time that they did not work may prejudicially inflame the jury to convict on improper grounds, confuse the jury as to the issue before them, thus, its moderate probative value to this case is substantially outweighed by its prejudicial effects.

This leaves us with nine very similar instances of Fiocca performing abysmal work, Dougherty hearing of it, and Dougherty taking subsequent actions that always lead to Fiocca getting another job. Without question, these nine instances are very analogous to each other and

to the extortion at bar, hence, the potential for a jury to use this evidence in a propensity way is high. The pinnacle inquiry then is how much, or how many, instances should be admitted so that the Government may appropriately put on evidence about the defendants' knowledge, motive and intent, while also balancing the degree of propensity, cumulative, and prejudicial evidence.

The Court has found that the appropriate balance described above under Rules 404(b) and 403 is met by permitting the Government to present the following and the remaining evidence is precluded as cumulative, and overly prejudicial.[4]

The Government may admit:

1) All March 2016 incidents:

- "Dougherty was told that after a supervisor on a job at Spring Garden Avenue admonished Fiocca for leaving early, Fiocca responded 'f**k you,' and during two conversations between Fiocca and Dougherty about the incident, Fiocca refused to accept any responsibility for his conduct." (*See* Gov.'s Motion to Admit Proposed Order, ¶e; Gov. Motion, at 10-12.)

- "Dougherty complained that Fiocca was putting him [in] a difficult position, and he had tried to make Fiocca understand that he put him on jobs where he could make extra money." (*See* Gov.'s Motion to Admit Proposed Order, ¶f; Gov. Motion, at 11-12.)

2) All April 2016 incidents:

---

[4] The Court finds no merit to defendant Fiocca's claim that permitting these statements, which were predominantly made only by Dougherty, infringe upon his Sixth Amendment Confrontation Protection. To this extent, his severance request is denied.

- "[A]fter Fiocca told him he was getting laid off, Dougherty told Fiocca that he had gotten him 'something good.'" (*See* Gov.'s Motion to Admit Proposed Order, ¶g; Gov. Motion, at 12.)

- "Dougherty complained that even though Fiocca was 'crazy' and kept getting 'smoked from one job to another,' Dougherty was doing 'as much as I can to help him.'" (*See* Gov.'s Motion to Admit Proposed Order, ¶h; Gov. Motion, at 12.)

- "[A]fter Fiocca was laid off from a job for spitting on the safety director, Dougherty called the job superintendent and apologized." (*See* Gov.'s Motion to Admit Proposed Order, ¶j; Gov. Motion, at 12-13.)

**III.  Conclusion**

For all the reasons above, Dougherty's Motion to Dismiss is Denied, Dougherty's Motion to Preclude the assault recording as a co-conspirator statement is Granted, and the Government's 404(b) Motion is Granted in Part and Denied in Part as described above.