**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO.   21 - 65 |
| JOHN DOUGHERTY | : | |
| GREGORY FIOCCA | | |

### GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by and through its attorneys, Jacqueline C. Romero, United States Attorney, and the undersigned attorneys, submits this memorandum in advance of trial.

### I.      Introduction.

Defendants John Dougherty and Gregory Fiocca are charged with conspiracy to commit extortion, in violation of 18 U.S.C. § 1951(a), and eighteen counts of attempted extortion and extortion, in violation of 18 U.S.C. § 1951(a) and (b)(2). Between August 19, 2020, and January 2021, the defendants conspired and attempted to obtain, and did obtain wages and benefits for Fiocca for services not performed, by the wrongful use of actual and threatened force, violence, and fear, including fear of economic harm.

### II.      Background.

Defendant John Dougherty was the Business Manager of Local 98 at the time of the charged offenses. In that role, he controlled the operations of Local 98, and all the union's employees, business representatives, and job stewards. Defendant Gregory Fiocca, the nephew of defendant John Dougherty, is an electrician and a member of Local 98.

In 2019, construction began on the Live!Casino on Packer Avenue in South

Philadelphia. One of the many contractors working at the site was McCrae/Gordon - A Joint Venture, LLC, a union electrical contractor, of which Ray Palmieri was an owner.

In October 2019, Dougherty had Palmieri hire Gregory Fiocca, who lived close to the work site. Dougherty also appointed Fiocca to be the Local 98 steward for Palmieri's employees, all of whom were members of Local 98. In addition to performing the job of an electrician, a steward is the representative of the union, and has certain rights and responsibilities, which are set forth in the Local 98 Collective Bargaining Agreement (CBA). They include the right of the steward to be the next to last person laid off when a job is nearing completion, and the responsibility of ensuring that overtime is equally and impartially allotted, and that the rules governing the union are followed.

### III.     Offense Conduct.

Once his employment began in the fall of 2019, Fiocca was frequently not present at his workstation and failed to perform many of the tasks assigned to him. As a result, he was sometimes paid for fewer than 40 hours of work for the week. He was also moved to different crews in an attempt to improve his attendance and performance. Nothing changed. When Dougherty was told about Fiocca's poor attendance and work performance by one of the foremen who supervised Fiocca, Dougherty blamed the foreman and the other Local 98 members who were supervising Fiocca, and took no action to hold Fiocca accountable.

### A.  Fiocca Assaults his Foreman – August 19, 2020.

On August 19, 2020, following a week where he did little work and was frequently absent, Fiocca received a paycheck that was for substantially less than 40 hours. In response, Fiocca confronted and assaulted Rich Gibson, a Local 98 member who was the project manager for the electricians who worked for Palmieri. Fiocca slapped Gibson, choked him,

- 2 -

threw him across a desk, spit on him, and threatened to beat him and Palmieri if they continued

to monitor his attendance and performance. Fiocca told Gibson that there was nothing they

(Gibson and Palmieri) could do to him and said that he and Dougherty would shut down the

job by pulling all the Local 98 electricians off the job site.

After getting a heated phone call from Fiocca telling him he was coming to his trailer,

Gibson decided to record his encounter with Fiocca on his phone.[1] Overt Act Six of Count One

alleges, and the government intends to prove, as reflected on the audio recording, that the

threats made by defendant Gregory Fiocca during the assault included the following:

> " . . . You owe me, 36 f--king hours; before I break your f--king jaw. . .
> Call an Agent. Call the [Union] Hall. There's nothing you can do to me.
> I'm getting my money . . . You think this is f--king, how this works? You
> think you're like, you think yous are untouchable? I'll break all of you,
> I'll f--king break your face and [the contractor's] face. How's that sound?
> . . .
> Stop f--king checking on me every day. Stop looking for me every f--
> king five minutes. And I won't break your f--king face . . . Listen, next
> time this happens again, it's not going to be no little f--king push. You,
> I'm going to punch you in your f--king face . . . check on me again, I'll
> break your face in the parking garage . . . We're pulling the whole job,
> you know that, right now. I'm calling my uncle already. We're pulling
> everyone off the job. F--k you now. Tell [the contractor] to come check
> on me tomorrow too. Soon as he's in the parking garage, and no cameras
> in there, I'll break his f--king face too."

Later that same day, not long after the assault, defendant John Dougherty made the

identical threat to one of the foremen on the job, stating that he would pull all the Local 98

electricians off the job. Dougherty also threatened to no longer allow the Local 98 electricians

---

[1]      That the recording may have been made in violation of Pennsylvania law, which
requires that both parties consent to have their conversation recorded, does not affect its
admissibility into evidence in this case. *See, e.g., United States v. Armocida*, 515 F.2d 49, 52
(3d Cir. 1975) ("So long as the information was lawfully obtained under federal law ..., it is
admissible in federal court despite a violation of state law."); *United States v. Baynes*, 400 F.
Supp. 285, 292–93 (E.D. Pa.), *aff'd*, 517 F.2d 1399 (3d Cir. 1975).

working for the contractor to work overtime; force the contractor to operate three shifts of

Local 98 electricians on the job; and prevent the contractor from getting future work in

Philadelphia. Carrying out any one of the threats would have caused great financial harm to

Palmieri and his employees. The foreman, as well as Palmieri and Gibson, all understood that

Dougherty had the authority and ability to carry out these threats.

### B.  Dougherty Orders the Contractor to Keep Fiocca as an Employee.

Shortly after the assault, Dougherty sent three representatives of Local 98, all of whom

Dougherty had appointed (and could dismiss),[2] to the job site - Assistant Business Manager

James Foy, Business Agent Robert Thompson, and Business Agent Robert Boland.

Gibson described to them in detail how Fiocca had assaulted and threatened him. Gibson asked

them if Gibson could remove Fiocca from the site. The three representatives left the

construction trailer and spoke with defendant Dougherty on the telephone. After the call, they

returned and stated that nothing concerning defendant Fiocca's employment was going to

change.

### C.  Fiocca Continues to be Paid Wages He did not Earn.

Despite the fact that Fiocca had assaulted his project manager, a fellow union member,

and despite Fiocca's abysmal work record, Palmieri could not afford to risk the possibility that

Dougherty would make good on his threats, which Dougherty had the ability and authority to

carry out, and which would inflict serious financial harm on Palmieri and his employees.

Palmieri also could not afford to risk the possibility that if he or any of his employees

---

[2]      Article XVI, Section 2 of the IBEW Constitution, states, in pertinent part, as follows:
"[The Business Manager] shall appoint any and all other representatives or assistants. These
shall work directly under him and be subject to his authority. He may discharge them at any
time."

attempted to hold Fiocca accountable, Fiocca would assault them. As a result of the fear caused

by the threats Fiocca and Dougherty made on August 19, 2020, Palmieri, Gibson, and the other

Local 98 members working for Palmieri who supervised Fiocca paid Fiocca, whether he did

any work or not. They realized that keeping their coworkers safe, and getting the job finished

on time was more important than trying to get Fiocca to earn his salary.

### D.  Dougherty's Statements to Local 98 Business Representatives-August 24, 2020.

On August 24, 2020, during a telephone conference with Local 98 business agents and

other Local 98 employees, Dougherty made the following statements about the assault:

> The Casino, five hundred Building Trades members, there is a second shift, job's running well . . . You know you guys have heard that, you know we had a minor issue down there.  And just so you know.  It had nothing to do about the last name of the person who was involved.  It had everything to do with the position . . .
>
> Ok so we had an incident at the Casino.  And for those who don't know the story, and **I heard a couple comments, which I ain't exactly thrilled with** . . . And [the electrical contractor who is the victim in this case] **was getting tired of paying Greg Fiocca.**  So, I told him with all them things on his plate . . . I'm shocked that he paid attention to a steward.
>
>  . . . So, when they dock the steward, **not Greg**, okay, and they made all kind of off-the-wall statement, okay, **it had nothing to do with Greg it had everything to do with the steward.  So, when the steward had a little physical confrontation, allegedly with the superintendent**, we weren't down there to make kumbaya.  F*** kumbaya.  F*** you want kumbaya become a f***ing Superintendent.  **You're a f***ing business agents representing the stewards.  Who we appoint.  Right wrong or indifferent**.  Okay? (Emphasis added).

In addition to demonstrating Dougherty's motive for unilaterally making Fiocca the steward,

which, despite Fiocca's poor work history, would make it more difficult to remove Fiocca from

the job, Dougherty's statement also shows that, rather than acknowledge that Fiocca was

responsible for assaulting a fellow member of Local 98, whose interests Dougherty was

supposed to protect, Dougherty criticized the business agents for not protecting his nephew.

Dougherty's misleading statements were clearly intended, among other things, to discourage anyone from challenging, or even questioning Dougherty's decision to allow Fiocca to remain on the job site, even though Fiocca had assaulted the project manager, not engaged in a "little physical confrontation."[3]

## IV.    Dougherty Knowledge of Fiocca's Prior Work Performance.

The government intends to introduce evidence that between March 2016 and April 2016, well before he appointed Fiocca as a steward, Dougherty had been informed that  Fiocca had engaged in conduct that, when combined with his lack of experience (he was an apprentice electrician in 2016), made him an unqualified candidate for the position of steward. This conduct included Fiocca confronting his supervisor when Fiocca was caught leaving early and then refusing to accept any responsibility for his misconduct. Additionally, Dougherty had been told that Fiocca was removed from one job because of his poor attendance, and because he had spit on the safety director.

Despite learning of these incidents and hearing Fiocca's dismissive response to each one of them, subsequently complaining that no one wanted to hire Fiocca, and that Fiocca's conduct put Dougherty in a difficult position, Dougherty never held Fiocca accountable for his conduct. Instead, he continued to get Fiocca work as a union electrician on desirable jobs.

In the Court's opinion of May 2, 2022, which ruled that the evidence described below is admissible, the Court explained as follows:

---

[3]    Although the government does not intend to present testimony from the person who made the recording, witnesses who are familiar with Dougherty's voice will identify him as the speaker. *United States v. Davis*, 918 F.3d 397, 403-04 (4th Cir. 2019) (recording of conversation in which the defendant was party was properly authenticated by a witness who did not participate in the conversation but testified that he was familiar with the defendant's voice).

The Government is correct that some of these prior acts displays the defendants' knowledge, intent, motive, and rebuts the defendants' likely defenses. Specifically, this evidence has non-propensity uses such as showing Fiocca's knowledge and plan as it pertained to his work, Dougherty's awareness of Fiocca's poor work performance, and Dougherty's absence of mistake, motive in keeping Fiocca a Local 98 employee and acceptance and support of Fiocca's performance. This evidence supports the Government's theory that the defendants had a longstanding relationship of Fiocca performing abysmal work, and Dougherty, as he allegedly did with his other family members, tolerated and supported Fiocca's behavior. This bolsters the Government's case-in-chief in that Dougherty did not simply side with his employee in an isolated dispute at the casino job. Rather, Dougherty was aware of the likely reality as to what happened at the casino job, but he still sided with Fiocca and still threatened the economic harm.

ECF 73, p. 9-10. Specifically, the government intends to introduce the following evidence which directly relates to the defendants' knowledge, intent, and motive:

### 1.    Spring Garden Street Project; March 2016.

In March of 2016, Dougherty had a number of conversations about a confrontation that Fiocca had with his supervisor on a job at Spring Garden Avenue in Philadelphia. A Local 98 Business Agent told Dougherty that the supervisor said that after he admonished Fiocca for leaving early, Fiocca responded by swearing at him. "f**k you, you f**king j**k-off, just lay me the f**k off then." During two conversations between Fiocca and Dougherty about the incident, Fiocca refused to accept any responsibility for his conduct and complained about the job. Dougherty repeatedly attempted to admonish Fiocca, who was an apprentice electrician at the time, and told him to "keep your mouth shut," but Fiocca argued with Dougherty, sarcastically thanking Dougherty for "the words of wisdom."

A few days later, on March 21, 2016, Dougherty called Brian Fiocca, the brother of Greg Fiocca, described the incident, and stated that "this is where he handcuffs us for no reason."

### 2.    Dougherty Finds Fiocca Another Job; April 2016.

Approximately two weeks later, after Fiocca told Dougherty he was getting laid off, Dougherty told Fiocca that he had gotten him "something good."

### 3.    Conversations About Dougherty's Frustration with and Continuing Assistance to Fiocca; April 2016.

On April 6, 2016, Dougherty complained to a Local 98 consultant that his nephew Gregory Fiocca was "crazy" and kept getting "smoked from one job to another." Dougherty added, however, that Dougherty was doing "as much as I can to help him."

### 4.    Market East Job; April 2016.

In or about April of 2016, Fiocca was laid off from a job at a construction project at Market East in Center City Philadelphia for his poor attendance and because he had spit on the safety director. Following this incident, Dougherty called the superintendent on the job, who had had a prior confrontation with Fiocca, and apologized.

## V.    Potential Evidentiary Issues

### A.  Text Messages are Admissible as Present Sense Impressions, Pursuant to Rule 803(1) of the Federal Rules of Evidence.

A number of Local 98 members who supervised Fiocca on the Live!Casino job will testify about Fiocca's work as an electrician on the Live!Casino jobsite. Text messages that these members sent to Fiocca, as well as each other, will be introduced into evidence to document their observations concerning Fiocca's attendance and performance. The exchanges with Fiocca are admissible as admissions of a party opponent, pursuant to Rule 801(d)(2) of the Federal Rules of Evidence. The text messages between the Local 98 members documenting times when Fiocca failed to perform the work that had been assigned to him, failed to show up for work on time, and left the jobsite early are admissible as present sense impressions,

pursuant to Rule 803(1) of the Federal Rules of Evidence. As previously stated by the Third

Circuit:

> There are three principal requirements which must be met before hearsay
> evidence may be admitted as a present sense impression: (1) the declarant
> must have personally perceived the event described; (2) the declaration
> must be an explanation or description of the event rather than a narration;
> and (3) the declaration and the event described must be contemporaneous.

*United States v. Mitchell*, 145 F.3d 572, 576 77 (3d Cir. 1998). *See also United States v.*

*Blakey*, 607 F.2d 779 (7th Cir. 1979) (victim's description of extortion attempt admitted as

present sense impression).

A present sense impression is admissible so long as it explains an event almost

immediately after it happens. Courts have recognized that the passage of a short amount of

time, however, will not preclude evidence otherwise admissible under Rule 803(1). *See United*

*States v. Blakey*, 607 F.2d 779, 785 (7th Cir.1979) (statements made within 23 minutes of event

admissible under Rule 803(1)); *Miller v. Crown Amusements*, Inc., 821 F.Supp. 703, 706–07

(S.D.Ga.1993) (statements made within 10 minutes of event admissible). *See also Fed.R.Evid.*

*803(1) Advisory Committee's Note* ("in many, if not most, instances precise contemporaneity is

not possible and hence a slight lapse [of time] is allowable.").

### B. Contents of Text Messages are Admissible as Prior Recorded Recollections, Pursuant to Rule 803(5) of the Federal Rules of Evidence.

The content of the text messages that are not contemporaneous declarations are

admissible as prior recorded recollections under Fed.R.Evid. 803(5), which states as follows:

> Recorded recollection. A memorandum or record concerning a matter
> about which a witness once had knowledge but now has insufficient
> recollection to enable the witness to testify fully and accurately, shown to
> have been made or adopted by the witness when the matter was fresh in
> the witness' memory and to reflect that knowledge correctly. If admitted,
> the memorandum or record may be read into evidence but may not itself
> be received as an exhibit unless offered by an adverse party.

This rule requires the witness to have either made the record, or to have reviewed and adopted the statement, at a time when the matter it concerned was fresh in her memory.  The rule does not state what constitutes a memorandum or record. What is required are the "circumstances which attest to its trustworthiness." *United States v. Williams*, 571 F.2d 344, 349 (6th Cir. 1978). Rule 803(5) does not specify any particular method of establishing the knowledge of the declarant nor the accuracy of the statement. *United States v. Porter*, 986 F.2d 1014 (6th Cir. 1993); *see also Parker v. Reda*, 327 F.3d 211 (2d Cir. 2003).

Should any of the witnesses in this case be unable to recall the dates or specific circumstances when defendant Gregory Fiocca was either late, did not work, did not complete work, left work, or oitherwise did not perform his tasks, the content of these texts will be read to the jury once they are identified by the witness and shown to fall within the ambit of Rule 803(5).

### C. The Victims of the Extortion Can Testify About Their State of Mind.

Testimony revealing the state of mind of an extortion victim is relevant in Hobbs Act cases. *See United States v. Repak*, 852 F.3d 230, 245 n. 4 (3d Cir. 2017) (testimony of state of mind of the contractors the defendant extorted, that they believed that they would lose work if they failed to agree to his demands, was admissible); *United States v. Stirone*, 311 F.2d 277, 280 (3d Cir. 1962) ("It is well settled that testimony showing the state of mind of the victim is permitted in Hobbs Act cases."). S*ee also United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987) (en banc) ("[T]he proof need establish that the victim reasonably believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment."); *United States v. Dozier*, 672 F.2d 531, 542 (5th Cir. 1982) ("[T]he victim's fearful state of mind is a crucial element in proving extortion.") (quoting

*United States v. Hyde*, 448 F.2d 815, 845 (5th Cir. 1971))); *United States v. Craig*, 573 F.2d 513, 520 (7th Cir. 1978) ("We believe that the state of mind testimony of the victims was admissible to show that the victims' consent was induced by defendant's office.").

The Third Circuit Model Jury Instructions on extortion reflect that the state of mind of an extortion victim is relevant and admissible. *See Third Circuit Model Criminal Jury Instruction* 6.18.1951-4 (2014) Hobbs Act - "Fear of Injury" Defined. ("You have also heard the testimony of the alleged victim describing his state of mind - that is, how he felt about giving up the property. This testimony was allowed to help you decide whether the property was obtained by fear.")

Ray Palmieri, an owner of the company that employed Fiocca; Rich Gibson, the victim of the assault and a long-time employee of the company; and the other project foremen and supervisors, were all victims of the extortion, as they all had a financial interest in the continuing operation of the business. *United States v. Burke*, 2023 WL 7110745, at \*4 (N.D. Ill. Oct. 28, 2023) (a victim of an extortion is someone who has a financial interest in the continuing operation of the business). *See also See United States v. Agnes*, 753 F.2d 293, 302 (3d Cir. 1985).

### D.  Defendants Cannot Elicit or Present Their Own Statements.

At trial, the government will present recorded conversations of defendants Dougherty and Fiocca that were intercepted as part of the court-authorized Title III wiretap conducted from April 2015 through August 2016, as well as recordings of the August 19, 2020, assault and Dougherty's statements of August 24, 2020. The government will also introduce statements the defendants made to testifying witnesses. The statements of the defendants are

- 11 -

admissible by the government as admissions of a party opponent under Fed. Rule Evid. 801(d)(2).

The defendants, however, cannot elicit or admit their own prior statements, because they are hearsay; if offered by the defendants, they are not admissions of a party opponent. The defendants cannot present any allegedly exculpatory statements they made by playing recorded conversations that were made during the court-authorized Title III wiretap, by questioning witnesses called by the government on cross-examination, or by any means other than through their own testimony. *See United States v. Kapp*, 781 F.2d 1008 (3d Cir. 1986) (affirming district court's ruling that tape recording of a conversation between a codefendant and government informant that defendant considered exculpatory on the issue of his knowledge of illegality was inadmissible because it was not offered "against a party" as required by Rule 801(d)(2)). *See also United States v. McDaniel,* 398 F.3d 540, 545 (6th Cir. 2005) (emphasis in original) ("Rule 802(d)(2) [ ... ] does not extend to a party's attempt to introduce his or her own statements through the testimony of other witnesses" . . . to hold otherwise would allow defendant to do "an end run around the adversarial process by, in effect, testifying without swearing an oath, facing cross examination, or being subjected to first hand scrutiny by the jury").

### E.  The Defendants Cannot Introduce Evidence of Prior Good Acts

The government anticipates that the defendants may attempt to introduce evidence of specific prior good acts, or recorded calls that do not reflect any statements or conduct that supports the charges in the Indictment, to rebut the charges against them. This is impermissible character testimony that is not admissible. A defendant is not permitted to introduce evidence

of his or her own good behavior, or even behavior that is not criminal in nature, on other occasions to demonstrate a lack of criminal intent during the commission of the charged crime.

Evidence of good conduct is not relevant to negate criminal intent and is merely an improper attempt to portray a defendant as a person of good character through the introduction of prior "good acts." *See United States v. Ellisor*, 522 F.3d 1255, 1267 (11th Cir. 2008) (evidence of defendant's allegedly legitimate business activities was inadmissible in his mail fraud prosecution because it did not bear on his intent to defraud with respect to the act in question); *United States v. Marrero*, 904 F.2d 251, 260 (5th Cir. 1990) ("The fact that Marrero did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment."). Testimony by others about the defendants' good works is improper character testimony concerning specific instances of purportedly good conduct and should not admitted.

Moreover, the Third Circuit has concluded that evidence of an absence of other particular bad acts is irrelevant. In *United States v. De Peri*, 778 F.2d 963 (3d Cir. 1985), for example, the court explained that "[e]vidence that not all vendors were extorted is irrelevant to the charge that defendants conspired to extort and did extort protection payments from certain vendors." 778 F.2d at 983–84; *Government of Virgin Islands v. Grant*, 775 F.2d 508 (3d Cir. 1985) (affirming lower court's refusal to allow a defendant to introduce testimony that he never previously had been arrested or charged with a crime). *See also United States v. Troutman*, 814 F.2d 1428, 1454 (10th Cir. 1987) (concluding that evidence that the defendant did not extort other companies was irrelevant to whether the defendant extorted a particular company as charged in the indictment); *United States v. Marley*, 2015 WL 3555793, at *3-*4 (11th Cir. June 9, 2015) (upholding trial court's decision to exclude evidence of good acts

- 13 -

performed by defendant in fraud prosecution on the ground that "evidence of the defendant's good conduct is not admissible to negate his criminal intent"); *United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011) ("prior good acts performed by the defendants allegedly for the good of the United States" inadmissible under Rule 404); *United States v. Washington*, 106 F.3d 983, 999 (D.C. Cir. 1997) (upholding trial court's decision to exclude evidence regarding the defendant's "dedication, aggressiveness and assertiveness" as a law enforcement officer on the ground that those traits were "neither 'pertinent' to nor an 'essential element' of his supposed lack of predisposition to engage in the corrupt criminal activity with which he was charged"); *United States v. Nazzaro*, 889 F.2d 1158, 1168 (1st Cir. 1990) (upholding trial court's decision to exclude evidence of "commendations received by" the defendant "in military service and as a police officer" on the ground that "the traits which they purport to show…were hardly 'pertinent' to the crimes of which [the defendant] stood accused"); *United States v. Russell*, 703 F.2d 1243, 1249 (11th Cir. 1983) (upholding trial court's decision to exclude evidence that the defendant "was a good county commissioner" on the ground that "[e]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant").

The defendants should not be permitted to distract the jury from the issue before it - whether the defendants are guilty of the charged conduct - by introducing evidence of other instances in which the defendants purportedly did not violate the law. If the defendants wish to introduce character evidence, they must do so in conformance with Federal Rule of Evidence 405(a), which limits such evidence to testimony simply stating the witness's opinion of the defendants' honesty or law-abiding nature, or the witness's knowledge of the defendants' reputation for those two traits, without evidence of any specific instances of conduct.

The government can rebut this type of evidence on cross-examination of character witnesses by inquiring into specific instances of the defendant's conduct. See Fed. R. Evid. 405(a) ("On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct."). But the defendants cannot introduce evidence that they did not commit crimes on occasions not charged in indictment, just as a defendant accused of bank robbery cannot elicit testimony that he walked past numerous banks without robbing them, and just as a defendant in a homicide case cannot elicit testimony that he did not murder many of his other acquaintances.  To do so would be to introduce impermissible evidence of specific alleged good acts in a case in which the defendant's character is not an essential element of any charge, claim, or defense.

### F.   The Government Can Question Character Witnesses About Specific Instances of Conduct, Including Past Convictions, Arrests, and Other Allegations Against the Defendants.

Rule 405(a) allows only two methods of proving character - reputation and opinion. Reputation evidence is from a person who knows the defendant's reputation in the community. It is not the witness's own opinion, but his or her understanding of what the community (as described by the witness) thinks of the defendant. Opinion evidence is the witness's own opinion about the defendant's character, which can come from a number of sources.  Fed. R. Evid. 405(a).

A witness called to testify regarding a person's character for honesty or law-abiding nature may not testify about specific instances of good conduct on direct examination. *Id.* According to the Rule, however, "[o]n cross-examination, inquiry is allowable into relevant specific instances of conduct." *Id.* Questions about specific instances of conduct, which would otherwise be impermissible, are allowed on cross-examination of a character witness for the

purpose of testing the character witness's knowledge of the defendant's reputation in the community, or the witness's opinion of the defendant.

The cross-examination permitted by Rule 405(a) includes prior bad conduct by the defendant. As the Supreme Court noted in *Michelson v. United States*, "The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." 335 U.S. 469, 479 (1948) (cross-examination of character witness regarding 20-year-old conviction for violating the trademark laws and 27-year-old arrest for receiving stolen goods permissible); *see United States v. Evans*, 569 F.2d 209, 210 (4th Cir. 1978) (trial court did not abuse its discretion by allowing the prosecutor ask character witnesses whether they knew of the defendant's prior convictions for larceny, assault with a deadly weapon, and receiving stolen goods, and of his arrests for assault on female, failure to stop for a police vehicle, and driving 110 miles per hour in 55-miles-per-hour zone); *Government of Virgin Islands v. Roldan*, 612 F.2d 775 (3d Cir. 1979) (asking whether witness knew defendant had been convicted of murder permitted); *United States v. Lundy*, 416 F. Supp. 2d 325, 337 (E.D. Pa. 2005) (inquiry into charges which were dismissed or conduct for which defendant was acquitted is proper).

Under Rule 405(a), the government may inquire into relevant specific instances of conduct to show the jury that the direct testimony about the defendant's good character paints an incomplete picture. By pointing to instances of a defendant's misconduct, the government can discredit the defendant's character witnesses by showing that they are too biased or too uninformed to portray the defendant accurately. Therefore, on cross-examination, courts have regularly permitted prosecutors to ask the defendant's character witnesses if he has heard about,

or if his opinion would be affected by, certain past instances of the defendant's misconduct, as long as the prosecutor has a good faith basis for his information. *See United States v. Glass*, 709 F.2d 669, 673 (11th Cir. 1983).

Cross-examination of a reputation witness can include questions "about conduct, and even about charges, which may have come to the attention of the relevant community*." See United States v. Curtis*, 644 F.2d 263, 268 (3d Cir. 1981)*.* These questions merely determine whether the information has come to the witness's attention. If the witness has not heard of specific acts inconsistent with his testimony for reputation, a jury may find the witness is too uninformed or the testimony is a fabrication. If the witness has heard of inconsistent acts and still believes the reputation is good, the jury may find that the witness's standard for good character is too low.

 Cross-examination of an opinion witness should focus on what the witness knows, to test the accuracy of and basis for the favorable opinion. In *Curtis*, the Third Circuit noted that, when the character witness testifies to an opinion, "relevant cross examination is only that which bears on the fact or factual basis for formation of the opinion." In addition, because an opinion witness testifies as to his or her present opinion, inquiry into any specific instance of conduct up to that moment when the opinion witness gives his testimony is permissible. *See United States v. Furst*, 886 F.2d 558, 577 (3d Cir. 1989).

Following this type of cross-examination, "the defendant is entitled to a limiting instruction to the effect that the prior bad act testimony does not bear on the defendant's propensity to commit such crimes again." *Government of Virgin Islands v. Roldan*, 612 F.2d 775, 781 (3d Cir. 1979) (trial court did not commit plain error by failing to give an instruction

where defendant did not request one). *See also United States v. Apfelbaum*, 621 F.2d 62, 64 (3d Cir. 1980) (emphasizing importance of limiting instructions).

### 1.  Court Can Limit the Number of Character Witnesses.

Limiting the number of character witnesses is a common practice and is within the Court's discretion. *United States v. Gray*, 105 F.3d 956, 963 (5th Cir. 1997) (affirming district court's decision to limit defendant to two character witnesses and noting that "[t]his court has repeatedly allowed a maximum of three character witnesses"); *United States v. Johnson*, 730 F.2d 683, 688 (11th Cir. 1984) (affirming district court's decision to limit number of character witnesses to three); *United States v. Koessel*, 706 F.2d 271, 275 (8th Cir. 1983) (affirming district court's limit of three character witnesses);  *United States v. Henry*, 560 F.2d 963, 965 (9th Cir. 1977) (district court did not abuse its discretion in limiting a defendant to two character witnesses).

### G.  Use of Summary Charts as Substantive Evidence.

To further promote an efficient presentation of the evidence and to aid the jury, the United States will seek to introduce charts into evidence that accurately summarize recorded telephone calls, emails, texts, and financial information under Federal Rule of Evidence 1006. The Rule provides that "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. With respect to the underlying records that support the summary exhibit, Rule 1006 requires the proponent to "make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." *Id.* Additionally, "the court may order the proponent to produce them in court." *Id.*

For example, the government intends to introduce into evidence summary charts that show the times and duration of telephone calls between witnesses and defendants on the day of the assault, August 19, 2020; and text messages documenting Fiocca's attendance during the week before the assault. The summary charts the government currently intends to use have been disclosed to the defense.

Under the Rule, parties are permitted "to use charts or other exhibits to summarize voluminous materials if a summary would be helpful to the jury." *United States v. Bansal*, 663 F.3d 634, 668 (3d Cir. 2011). The Rule's "purpose . . . is to provide a practicable means of summarizing voluminous information." *United States v. Hevener*, 382 F. Supp. 2d 719, 729 (E.D. Pa. 2005) (internal quotation marks omitted). The district court retains broad discretion in determining whether records are sufficiently voluminous or complex to qualify for admission under Rule 1006. *See, e.g., Bansal*, 663 F.3d at 668 (3d Cir. 2011); *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 299 (3d Cir. 1961). Notably, "Rule 1006 does not require that it be literally impossible to examine all the underlying records before a summary chart may be utilized, but only that in-court examination would be an inconvenience." *United States v. Onque*, 169 F. Supp. 3d 555, 574 (D.N.J. 2015) (alteration and internal quotation marks omitted), aff'd, 665 F. App'x 189 (3d Cir. 2016).

Once the requisite foundation is provided, a Rule 1006 summary may be admitted into evidence and go to the jury like any other admitted exhibit. *See, e.g., United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013); *United States v. Faulkenberry*, 614 F.3d 573, 588 (6th Cir. 2010); *United States v. Janati*, 374 F.3d 263, 272–73 (4th Cir. 2004). Because a Rule 1006 summary is itself evidence, no limiting or cautionary instruction is generally required. *See, e.g., United States v. Williams*, 264 F.3d 561, 575 (5th Cir. 2001) ("A summary chart that meets the

requirements of Rule 1006 is itself evidence and no instruction is needed."); *United States v. Bray*, 139 F.3d 1104, 1111–12 (6th Cir. 1998) (concluding that the district court was not required to give a limiting instruction when it admitted in evidence charts under Rule 1006). It bears mention, however, that Rule 1006 does not require the summary preparer to be made available to testify. *United States v. Lynch*, 735 F. App'x 780, 786 (3d Cir. 2018).

### H.  Use of Summary Witnesses.

The government expects to use government employees, including law enforcement special agents, to testify as summary witnesses in connection with the presentation of some of the evidence described above. Summary testimony is also appropriate under Federal Rule of Evidence 611(a) if the evidence will aid the jury in ascertaining the truth and will not be overly prejudicial to the defendant. *United States v. Haidara*, 112 F.3d 511, 1997 WL 205378 at *2 (4th Cir. 1997). In this case, there will be numerous records and other evidence presented at trial about which a summary witness may testify and summarize. *United States v. Moore*, 997 F.2d 55, 57-59 (5th Cir. 1993).  If the records summarized are in evidence, any underlying assumptions are made explicit, and the witness is available for cross-examination, the summary is appropriate. *See id.; see also Haidara*, 1997 WL 205378 at *2.

### I.  Presence of Summary Witness at Trial.

The government will call Auditor Cynthia Fusco as a summary witness who will introduce summary charts prepared by her that are based on the evidence that will be presented at trial before her appearance. For this reason, the government requests that she be permitted to sit in the courtroom during the government's case-in-chief. This arrangement is a permissible practice in federal court. *See, e.g., United States v. Pilitz*, 2022 WL 14763150, at *3-4 (E.D.N.Y. Oct. 25, 2022) (court permitted IRS agent who would summarize bank and financial

records to be present during testimony, stating that the "summary testimony must be based on the evidence. Her presence therefore is essential"). Furthermore, because she is not testifying about any observations of the events that are the subject of this case (because she did not observe them), Ms. Fusco's presence will not be contrary to the purpose of sequestration. *See United States v. Strauss*, 473 F.2d 1262, 1263 (3d Cir. 1973) (because the agent's "testimony related only to a summary of records . . . even the rationale for the sequestration of [the agent] was absent in this case").

## VI.    Conclusion

The foregoing is not meant to be a complete preview of all evidence and issues that will be presented during the trial.  The government reserves the right to address additional legal issues as they arise.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

*/s/ Frank R. Costello, Jr.*
FRANK R. COSTELLO, JR.
JASON D. GRENELL
Assistant United States Attorneys

Dated: April 16, 2024

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, I electronically filed the foregoing trial memorandum with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants, who are identified below.

Gregory Pagano
Counsel for Defendant John Dougherty

Rocco Cipparone
Counsel for Defendant Gregory Fiocca

/s/ Jason D. Grenell
FRANK R. COSTELLO, JR.
JASON D. GRENELL
Assistant United States Attorneys

Dated: April 16, 2024